May it please the Court. The District Court abused its discretion when it denied the plaintiff's motion for a preliminary injunction because it erroneously held that the plaintiffs had no likelihood of success on the merits and that the balancing of equities was equal. The District Court's merits determination was clearly the key to the District's balancing of the equities and the ultimate decision not to issue the preliminary injunction, so my argument will focus on the merits. Where the merits are based on applying the law to an undisputed record, this Court's review is de novo. The District Court repeatedly deferred to the defendants and deference is certainly appropriate to the agencies, but deference under the APA, NEPA, and the ESA also requires complete candor. And the defendants' conclusions at issue and the analysis here was just simply missing key information and deference is not appropriate under those circumstances. The Court cannot defer to avoid. I'd like to start with the defendants' determinations about bull trout. The defendants' arguments are based before this Court on what they might have done and what they could conclude based on all the relevant evidence, but the real dispute here is that all of the evidence was not discussed or even disclosed in the defendants' decision documents. A key point, I believe, is that the public and the agency decision makers reading the final environmental impact statement, the biological assessment, or the U.S. Fish and Wildlife Service's letter of concurrence would not know that the Oregon Department of Fish and Wildlife considers there to be an existing population of bull trout in Eagle Creek. And they would not know that in 1997, the Forest Service itself stated in its watershed analysis that they needed more information in order to make the determination of whether bull trout were or were not in Eagle Creek. Those two things are simply not disclosed by any of these documents. And those significant omissions from the record show that the agency failed to consider an important aspect of the problem in violation of the APA, NEPA, and the ESA. NEPA requires a full and fair discussion of all the significant impacts. We're not asking the Forest Service to address every scientific uncertainty or this court to act as a panel of scientists. But, frankly, there is simply nothing fair about the incomplete quotation in the FEIS where the Forest Service is talking about the 1997 Buchanan report, talks about the actual surveys that were done in the 90s, and then leaves out the sentence where the report says that the status of bull trout is a question mark. And on the page immediately preceding that, the Forest Service says that it consulted a number of sources about bull trout, including the Native Fish Report, which is prepared by the Oregon Department of Fish and Wildlife. Now, we saw that in the FEIS, and we went and looked at it, and we were quite surprised that the Native Fish Report actually says that the Oregon Department of Fish and Wildlife considers there to be an existing population of bull trout in Eagle Creek, and that the 1990 surveys that Oregon Department of Fish and Wildlife did are stale. How old does it have to be to be stale? Your Honor, I think that's a relative determination, and there's some case law from this court that suggests that data as recently as 6 years old can be stale. Other cases talk about 10 years old. Here, we're talking about surveys that were done in 1991 and 1994, so we're getting close to 20 years on some of those surveys. And I think it's important to realize that the 1997 Buchanan Report discusses the fact that even though they did surveys in Eagle Creek, they did not do surveys in two branches of Eagle Creek, which are also listed as critical habitat for bull trout. Bull trout are migratory, and the status of the bull trout in those two streams is considered, quote, unknown. So there's reason to believe that if you went back to look, they might be there now. And in fact, that's pretty much what the Oregon Department of Fish and Wildlife said. Is bull trout an endangered species or a threatened one? It's a threatened species, Your Honor. Does that affect our analysis? I don't think it does, Your Honor. And it's your position that the bull trout problem is a problem both under NEPA, because there's not, like, a fair review on the record, and under the ESA? Yes, Your Honor. Because it's not the best science? Yes, Your Honor. I believe they violated both of those statutes. Under NEPA, they simply didn't disclose it, which I think is key. But under the ESA, they are required to use the best available science, and under the APA to consider all the relevant aspects and important aspects of a problem. And it's our view that the Native Fish Report, at a minimum, needed to be considered as part of the BA and part of the letter of concurrence. Under the APA, I think, there's a Supreme Court decision called State Farm. So how does this come within the State Farm standard? Your Honor, I think one of the things State Farm lists, and I believe this is repeated in the Lands Council en banc decision, is that the agency has to consider all the relevant factors, and we would believe that the Native Fish Report is one of those relevant factors. The best available science standard under the ESA, which Your Honor also asked about, requires the agency to look at the best available scientific data. The defendants here are taking the position that that just means the surveys. In other words, they can just look at the surveys and they can ignore scientific conclusions about those surveys. That is both inconsistent with the Forest Service's own description in the FEIS of what is the best available science. There they talk about other scientific conclusions, and they specifically say they're going to look at contrary conclusions. It's inconsistent with the Fish and Wildlife Service's consultation handbook, which talks about looking at other concurrence decisions. And it's also inconsistent with this Court's decision in Tucson Herpetological Society, where one of the reasons the Court reversed the BLM's determination there was because BLM was pointing to a scientific report and the Court came to an opposite conclusion from the scientists there, and the Court said they had to at least consider what the author of the report thought about the data. So here it's important that all of the underlying data that the Forest Service is pointing to has been collected by the Oregon Department of Fish and Wildlife. So I think I understand your position is that with regard to the bull trout, we've got violations of NEPA, the ESA, and the standard under the APA. Yes, Your Honor. Okay, but now there are a lot of other issues in this case, so maybe you could address, at least in terms of ones that I'd focused on, the issue of the cover for the elk in light of the travel management plan and also whether the timber cutting on the 130 acres is a separate proposal or whether it had to be in an SEIS. Certainly, Your Honor. I'll start with the travel management plan. Your Honor, the travel management plan, the Forest Service used that in the FEIS. It was not in the DEIS. They added it to the FEIS and repeatedly referred to it, and we actually don't believe that was improper because it was a clearly foreseeable project to say the travel management plan, by closing more roads and most significantly by preventing over cross-country travel, was going to benefit wildlife, was going to benefit a whole list of things. I mean, I think I've come up with 12 different places in the FEIS where the Forest Service relied on the travel management plan. It's not an isolated reference. With regard to elk, which we think is one of the most important places, they clearly relied on it to say that even though roads, and especially the logging associated with the roads, could have adverse impacts on elk and their cover, that the travel management plan, as part of the cumulative effects analysis, would have a net reduction in roads and would benefit the elk. So they clearly were telling the public, and even in response to public comments, they said don't worry about the impacts of the logging. The travel management plan is going to take care of those things. Counsel, could you point in the record, there's about eight pages, this is discussed, I think, between ER 407 and ER, well, starting there. And the question really that I have is whether it's fair to say that the government said that this plan, these alternatives pass muster vis-a-vis that consideration, and it's likely to get better once this travel management plan reduction is approved, as opposed to the way you're phrasing it, which is that they really depended upon this projected reduction. Well, Your Honor, I think they did depend on it in the sense that they cited to it, they said these are the impacts with the logging, but these are the negative impacts, but these are the impacts which will be less adverse and even beneficial to elk with the travel management plan. Well, you know, I read it differently, and I appreciate your point, but if you're able to, maybe when you come back to the podium, those are the places in the excerpt where I'm looking, and if you want to point to part of the excerpt where you think I'm misreading it, I'm just inviting you to do so. Certainly. I mean, the sites I have right here in front of me are 412 and 414, and in response to public comments, ER 742. Okay, thank you. When they pointed this out to the public. I didn't really understand your argument to be that the government's conceding that without the travel management plan, there would be unduly adverse environmental effects, but rather that once that plan is put on the shelf, that they had to do a supplemental environmental impact statement. That's correct, Your Honor. Wouldn't that only be true if they had depended upon this projected reduction, depended upon the passage of the travel management plan? Your Honor, we do not have a NIFMA challenge here. This is a NEPA disclosure of environmental impacts, and it's our position that the cumulative impact analysis here simply is not complete unless you do one that both looks at the travel management plan, but now that it's gone, what are the cumulative impacts going to be if you have resumed cross-country travel? There's no analysis of that anywhere. That if you've got the OHVs, again, running all over the place without the TMP, what is the impact going to be on elk? I believe the district court decision we cite to the lands council is almost directly on point on this issue. When you have a plan, there it was a fire management plan, that you relied on for your cumulative impacts analysis, and then you withdraw it and SEIS is appropriate. And that begs the question. You think they've relied on it? I do. Okay. Jay, could you at least briefly discuss the clear cut or, you know, the logging? It's 130 acres, Your Honor. And as to why you think that's part of this proposal? I'm sorry. It can't be put off to another evaluation? Your Honor, it's part of the proposal because it started off as part of the proposal. It was in the DEIS. It was 170 acres then. They got a lot of complaints from the public. Then they pulled it. And then immediately after the appeal process, suddenly we see 130 acres in the same units. They dropped a few, but it's in the same units where they're going to do essentially the same kind of logging, slightly different group selection versus a more intensive kind of regeneration. But it's part of the same proposal. But don't they say they would put out a new environmental impact statement on that 130-acre clear cut when they got around to it? And if that's true, how is this like a concrete enough action now that it has to be evaluated for cumulative impacts? Your Honor, one of the requirements for cumulative impacts is to look at reasonably foreseeable actions at the time you analyze the action in question, which here would be the snow basin project. They certainly can do it now. The Northern Plains Surface Transportation Board decision talks about that. There's no reason not to do the analysis now. It also matters here because the logging they're doing now, the thinning, is much more flexible. The logging they're proposing in the future, regeneration logging, requires them to take out most of the trees in order to get the result they want. So if they wait and do it later, they're going to have much less flexibility if they determine, you know, maybe we really should not have cut so many trees. The time to do that analysis is now to look at the area around these units and say, when we do the regeneration and the thinning, is that going to be too much logging for the forest? If they do it now, they can adjust their analysis appropriately. If they do it five years from now, it's too late. Well, is there any way to modify the injunction and limit the prohibited cutting pending trial to just the – to exempt from the cutting the large trees that you're most concerned about? Your Honor, we are concerned about the logging of the large trees, but we're also concerned about the volume of logging, and that's quite clear from the declarations that we filed, that the clients are concerned just about the number of larger trees that are being taken, and it's not just the trees over 21 inches in diameter. So it's the volume of logging that's issued here as well. So we would – certainly the court could do that, but that is not what we would request, and we don't think that's justified by our merits determinations and our merits arguments here. And I would like to reserve the last minute I have for rebuttal, Your Honor. Thank you. Thank you, counsel. So we'll turn to the – is this the Government's counsel? Yes. Blake County. I am for the government. Okay. David Gunter from the Department of Justice here for the Forest Service. I'm going to spend 11 minutes of argument time discussing why the district court correctly concluded that the plaintiffs are not likely to win on the merits, and then Ms. Lobdell for the interveners is going to spend four minutes discussing the equities of the case. Okay. Fine. Thank you, Mr. Gunter. The Snow Basin Project area looks very different now than it did 100 years ago. It's denser. It's made up of different trees, primarily Douglas fir and grand fir, whereas it was once a more open landscape of ponderosa pine and larch. The purpose of the Snow Basin Project is to address that change and return the forest to its more historic state of large, open-grown ponderosa pine and western larch. The EIS that the Forest Service completed in order to analyze the environmental effects of this proposed project was fully adequate. It's more than 400 pages and discusses every relevant aspect of the environmental consequences of the project. But the Forest Service had to draw some lines somewhere, or the EIS project would threaten to become so unwieldy that it would never be complete. So it declined to discuss the effect of the project on bull trout, which are not present in the subject area, in the project area, so there's no need for obligation to discuss them. And it also drew lines that it would not discuss the potential future group selection sale that it actually removed as part of this project. I'd like to discuss today why those line-drawing exercises were reasonable, and I'll start with the issue of bull trout. We're all looking at the same data on bull trout. We agree that there is a historical presence of bull trout in Eagle Creek. There were officially confirmed sightings in the 1960s, although those sightings drastically declined after a fish poisoning project in 1967. We agree that the snorkeling surveys in the early 1990s identified no bull trout present in Eagle Creek, despite the joint efforts of the Forest Service, the Bureau of Land Management, and the Oregon Department of Fish and Wildlife. And we're looking at habitat data since then that indicates that Eagle Creek is not a hospitable place for bull trout to remain. Based on that, the Fish and Wildlife Service, when it put together its bull trout recovery plan, the Fish and Wildlife Service has to identify how it can assist the recovery of listed species. And it did that for bull trout in 2010, concluding that Eagle Creek was a potential spawning and rearing habitat for bull trout. But as part of that determination, the Fish and Wildlife Service determined that bull trout are not present in Eagle Creek. That's something that the Forest Service relied on here in the EIS, and that the Fish and Wildlife Service relied on in its letter of concurrence. Now, the argument is made that the contrary, you said the same data, but was it FWS that reached an opposite conclusion on the same data earlier? The Fish and Wildlife Service released a watershed assessment in 1997 that said that bull trout are probably extinct in Eagle Creek, and that's a quote. Now, some of these reports have left open the possibility that the snorkeling surveys simply didn't find bull trout, but they may continue to be present there. But for purposes of this EIS, the Forest Service had to make a conclusion. It couldn't simply say we're going to wait and see and wait and see a little bit longer. It had to reach a conclusion, and so it did. It concluded that the best available science was the snorkeling surveys, and that those surveys indicated that bull trout are no longer present in Eagle Creek. Now, what's interesting about the point plaintiffs are making this morning about disclosure and participation is that they say the Forest Service had an obligation to identify those reports as an opposing scientific viewpoint and explain why it chose to conclude that bull trout were absent. But that's belied by the way that plaintiffs presented this point before the Forest Service in the administrative appeal proceeding. The Supreme Court in Vermont Yankee says that plaintiffs have an obligation to structure their participation to alert the agency as to their position. But here, if you go and look at their administrative appeals, they ask the Forest Service to justify why it could rely on the Oregon Department of Fish and Wildlife reports and the 1997 Forest Service report, which they claimed at that time were outdated. So in responding to those administrative appeals, the Forest Service addressed that point and explained why it thought those surveys were the best available data. It didn't go on to say we recognize a different scientific conclusion in those reports and we believe our conclusion is correct for the following reasons, because that's not an issue that the plaintiffs ever asked them to address. Plaintiffs didn't identify that as a responsible scientific conclusion. In this court's decision in Loud v. Allen involving the same plaintiff, the court said that in order to force an obligation on the agency to respond to opposing scientific viewpoints, the plaintiff has to show that there is a significant scientific controversy and give reasonable support for that. And I don't think that happened here. In fact, if you go back and look at those reports, each of the Oregon Department of Fish and Wildlife reports says if bull trout are present in the area, their number and distribution are extremely limited. So although it's difficult to prove a negative, which is the burden that they're asking the Forest Service to carry here, there's nothing actually in the reports they cite to indicate that there is a presence of bull trout in Eagle Creek. What about the report that somebody caught bull trout in Eagle Creek in 1995 after the snorkeling surveys? There are angler reports at various points in history, and the Forest Service said that the last officially confirmed report was in 1968. So the Forest Service did list those angler reports as a data point, disclosed them, didn't try to hide them, but it's a quintessentially agency prerogative to decide how much to weight different points of evidence that come before it. And so under the APA and NEPA, the Forest Service disclosed that, but also had the discretion to decide how much to weight that. They can treat it as a fishing story. They can treat it as a fishing story in effect. And to the Forest Service's credit, they disclosed it, but when the plaintiffs asked them to explain in the administrative appeal what is the best available science, the Forest Service identified the actual surveys in the water that had been conducted by the state and joint federal agencies as the best available science. And that was a reasonable conclusion for it to reach. Now even in the end, the Forest Service's conclusion actually in the EIS was that bull trout have likely been extirpated from this watershed. Did not state it with complete certainty, but stated it with enough certainty and outlined the evidence that they were relying on to conclude that the Snow Basin Project will not have any significant effects on bull trout. How about the Oregon Environmental Agency? What did it say about the bull trout? The most recent Oregon report I believe is in 2005 and identified Eagle Creek as the location for an existing population of bull trout. But if you go back and look at what that report says, it repeats the same language from earlier reports that if bull trout are present in Eagle Creek, their numbers and distribution are extremely limited. And before the district court, the plaintiffs admitted that the reports they're relying on are based mainly on historical presence. Now I think a useful way to look at this might be to imagine if the situation were reversed. If the Forest Service had used that report to find that bull trout are present in Eagle Creek, would that have been an arbitrary and capricious conclusion? Under this court's Arizona cattle growers decision, it would be. In that case, the Fish and Wildlife Service issued incidental take statements implicitly finding that pygmy owls were present in the study area based on a historical presence, even though more recent surveys had failed to detect any pygmy owls. And this court said that was arbitrary and capricious, that the Fish and Wildlife Service could not do that in this case. Before your whole argument time is gone, I would appreciate it if you would address both the issue of the tabling of the travel management plan and its impact of that on elk cover, and also whether the regenerative harvesting of 130 acres should be part of this proposal to be evaluated. Yes, let me take those issues in that order. First, with respect to the travel management plan, I would point you to ER 313, which is in the EIS, where the Forest Service said that there is a travel management plan under consideration and there is a low risk of positive cumulative effects with the travel management plan and the Snow Basin Project. Now, low risk in the EIS is a term of art. That means insignificant or discountable risk. So to the extent the Forest Service was relying on the travel management plan, which I don't think it was, but to the extent it was, it was relying on it only to add an insignificant benefit to the effects of the Snow Basin Project. But I also agree that if you look at the pages of the excerpts of record that Judge Christen pointed out, it does not indicate that the Forest Service was relying on the travel management plan in any relevant way. In fact, it quantifies using a quantitative metric called Habitat Effectiveness Index what the effect of the Snow Basin Project would be on elk cover without the travel management plan taken into account. Then it goes on to say also there is a travel management plan, there is a possibility that that will have positive cumulative effects. Are you referring to ER-409, this distance banding of roads, the HEI? Is that the chart? Yes, the HEI, Habitat Effectiveness Index. Yeah, so I go down to Little Eagle Sub-Watershed and I look in the HEI column, and what you're saying is that the 0.58, 0.60 numbers are calculated without regard to the TMP? That is my understanding, yes. I hope I'm looking at the right chart. Well, so am I, but that's what was cited. It's dense. And then later on, though, there was a discussion which does a lot of talking about the TMP. Go ahead, you said you have some more insight? No, I am looking, and I think this is the right chart, because if you look at it, it says existing HEI under Little Eagle Sub-Watershed. There are four lines. One is existing HEI, and then the others are what the HEI would be after implementation of Alternative 2, 3, and 4. And Alternative 2 is the Snow Basin Project. Okay, so Alternative 2, and you're saying, in essence, what they're saying is that 0.60 would not change materially at all, if at all, if the TMP didn't go forward. That's right, with that particular metric. So to wrap up this point about the Travel Management Plan, the case law provides that a supplemental EIS is required if new information presents a seriously different picture of environmental effects, and those environmental effects have not already been considered. And here, the EIS shows that the effects of the Snow Basin Project without the Travel Management Plan have already been considered. Finally, let me turn to the group selection, although I see that my time is almost up. The plaintiff's argument here seems to be that because a regeneration harvest started off as part of the project, it has to stay as part of the project, no matter whether the Forest Service intends to go through with it or not. In fact, the Forest Service removed a regeneration harvest as part of the project and has no plans to implement that within the next five years. There was a declaration submitted to the District Court that the Forest Service has no immediate plans to do this. Although the case law does provide that reasonably foreseeable future actions have to be considered in cumulative effects analysis, Forest Service regulations define reasonably foreseeable future actions to be those actions for which there is an identified proposal, and that is a proposal for which NEPA analysis must currently be done. So you see, for example, in the example of the Travel Management Plan, there's an EIS for that action, and so the Forest Service knew what the environmental effects would be from the EIS and studied how they would interact with the Snow Basin Project cumulatively. I don't mean to interrupt you, but you're a minute, more than a minute over your time. I think we should bring it to a conclusion unless we're going to take the time off. No, I would be happy to conclude. I think that the record here indicates that the Forest Service took a hard look at all of the relevant issues under NEPA and that plaintiffs have no likelihood of success in the merits below, and so we would ask the Court to affirm the denial of the PI. I appreciate we're trying to get the clock, but I'd like to ask a clarification on the reasonable foreseeable action. That was referring to what? The question is whether the group selection treatment that was discussed in the EIS correction notice. Are we talking about the cutting? Have we moved away from the TMP, or are we talking about the cutting? We have moved away from the TMP. That's what I thought. So you're saying that the injunction, which would extend to the cutting project, because I raised the question, is there a way to selectively limit an injunction to large trees? Council said, no, they're concerned about volume. You're saying that that is, in effect, moot because the project's off the table? Yes. The group selection project, the group selection treatment is off the table. There is no proposal for it. I think your question may have been whether there was some other way to have a limited injunction that would limit the cutting of large trees. I think if the Court finds that they're likely to succeed on the merits, then it should narrowly tailor any relief that it grants. All right. But I don't think that that is appropriate because they will not succeed on the merits, in my view. All right. Thank you. Thank you. Okay, then. Baker County. And that's Ms. Lopdell. Good morning, Your Honor. It's Caroline Lopdell on behalf of Defendant Intervenors. And I'll be addressing the issue of the balance of harm between the parties and the public interest. Mr. Bichelle opened today by saying that the district court abused its discretion on the balance of equities and the public interest because of the likelihood or the decision on the likelihood of the merits. And, Your Honor, Your Honors, that's the wrong analysis. First, Judge Hernandez made two independent findings. He found, on page 33 of his opinion or somewhere near there, that a temporary injunction was not warranted in this case because the plaintiffs did not make a clear showing of the likelihood to succeed on the merits and that the balance tipped in their favor. And instead, he made a factual finding that the balance was a tie, that they were equal. We agree with Mr. Bichelle's opening that the standard here is an abuse of discretion. And in the U.S. v. Henson, we determine that to decide if Judge Hernandez's factual determination that the balance was equal is supported by the record, logical and plausible. And to do that, we just take a step back and go back. What did the district court have before it? First was there were two reported harms made by plaintiffs or appellants, old-growth trees and recreational harm. The court heard this evidence on the old-growth trees. The executive director, Daryl M. Brown, testified. Oh, sorry. Thank you. Thank you. You're doing fine. It's just my amplification was just getting overwhelming up here. Usually we ask people to speak. I'm sorry. Don't apologize. Old-growth trees. One person, Daryl M. Brown, testified live testimony in front of Judge Hernandez that she identified one tree in one unit on one sale that was potentially an old-growth tree. The Forest Service responded and said, if that's true, and we confirm that, we will delete the tree from harvest. The next harm was the recreational harm. By the way, there are multiple references in the administrative record that old-growth trees are not being cut, but that's actually not the issue that the appellants brief on this issue. That was just what the district court heard, and that's why I raised it. Second was the recreational harm. Now, out of convenience, I provided ahead of time three photos. The first one is the ISER 148. This is an aerial photo. This is evidence, again, that the district court heard. They received declarations from the environmentalists or not the environmentalists, environmental groups, the appellants here, that recreational harm and their use of the environment was at stake from the cutting of the trees. Well, let's look at what the district court weighed on that issue. Before them was this photo, ISER 148, which is part of Mr. Fullerton's declaration, that shows an open-space mixed-vegetation forest. Next, ISER 150, that shows post-harvest forest after the puzzle sale, which is very similar, although plaintiffs did not seek to enjoin that. Finally, Sherry Myers, ISER 50. This is a forest that was harvested over five years ago. This is what it looks like, and she testified that her recreational use were increased and that in the vicinity there was more recreational use. So when the district court made its ultimate finding and decided to come down on cases like McNair and Carlton to find that it was more similar to those cases, cases involving logging, environmental harms, there's no automatic injunction, and Judge Hernandez came down on the side of Carlton and McNair instead of Alliance, and that is not an abuse of discretion because it is supported by the record, testimony of economic impacts to the counties, to the Forest Service. Alliance had $16,000 to $70,000 at stake in the economic harm there. The record in front of Judge Hernandez were $1.2 million revenue to the Forest Service, $275,000 to Baker County that is in impoverished, crushingly poverty-stricken conditions. Okay, Counsel, if any judge has questions, they can go on, but your time is up. You're over your time. I'm sorry, Your Honor. We had separated the time of you and the government. Normally we link them together, and if one of them goes over, we take away from the other. We wanted you each to have a separate say, but could you conclude your argument? Yes, Your Honor. I can conclude that the record supports Judge Hernandez's findings, and I'm available to answer any questions to the Court. I did lose 20 seconds on this part, so I'm not that over. You are over. Hopefully. That's what he said at the beginning. It's counting up. It's adding time. I see, Your Honor. Thank you. I don't mean any disrespect. We know that. We appreciate the pictures. You were interrupted. What about the microphone? So everything is very cool and fine. Thank you, Your Honor. I think we have to go forward. Thank you, Your Honor. Thank you very much. I thought that was a good response. He did move her microphone. That's good. Counsel, I have a couple of questions. Can I ask you? Absolutely. Can they treat the 1995 Engler Report as a fish story? I think it's a factor, Your Honor. I don't think it's as important as actual scientific surveys, but I think it's evidence. Okay. And there continue to be, and they noted it. They did. And I don't think it's just a fish story. Okay. But they had an obligation to disclose, and they did. They did in the BA. They did not in the FEIS. My other question goes to ER-414. There's a sentence, and I just want to give you a fair chance to – it's pretty dense, as Judge Fischer said, that portion of the record. But there's a sentence there at sort of the bottom of that page, about three-quarters of the way down. It says, treatments proposed under all action alternatives are expected to maintain or slightly improve elk habitat effectiveness as indicated by the HEI values. Habitat – well, anyway. So this is the part of that report where I – there's other pages, too, where I'm questioning whether it really relied on this anticipated travel management plan change, or whether they're saying it's okay and it's going to get better. Could you respond to this sentence? Your Honor, I believe they have an obligation under NEPA to look at the cumulative impacts. And the cumulative impacts they looked at included the TMP. Well, this says under alternatives two, three. That's not how I read this. What am I missing here? Your Honor, the sentence I was going to point out to you on that same page is, at the very end of that paragraph, since the TMP is a reasonably foreseeable future project, it is reasonable to predict that implementation will bring this area in line with road density standards. And then on 412, which was the first page I pointed your Honor to, it says, the net reduction of approximately 12 miles of roads and the elimination of unregulated cross-country travel will result in, not minor, substantial improvement in elk security habitat in the Snow Basin Project area. No question they thought that the TMP that they were anticipating was going to improve things, right? Okay. The question is whether they relied upon it. And I think you've answered the question. This is the sentence I'm struggling with. Right. I guess it depends on what you mean by rely. And I think they did. I mean, when they tell the public what the impacts are going to be, they're pointing the public to this. Did they ever look at what the impacts were going to be with the continued cross-country travel? I don't see that anywhere where they talked about that. But really quickly, to rebut a few of the points we heard, if I may. First, in terms of the balancing of the harms, the Court's precedent clearly says if plaintiffs prove a likelihood of success on the merits and show likely irreparable harm, that the balance will usually tip in favor of an injunction, absent, you know, critical circumstances. And I think the Court's decision in the Alliance for the Wild Rockies is on all fours with this case, is whether an injunction would be appropriate if we've shown likelihood of success and irreparable harm. Now, Counsel, you're over your time, but they went over their time a little too, and we've questioned you. But could you try to wrap up here? I will, Your Honor. Just the last point I wanted to make was we heard from the Department of Justice a lot about how we did our administrative appeal. They did not raise a failure to exhaust claim before the district court. That's what that sounds like to me. If they want to make a failure to exhaust claim, I would appreciate them doing it. I think the administrative appeal here, which I wrote, quite clearly says that the Buchanan report and the prior surveys were stale. That was the point we were making. And it said we found this 2005 Native Fish Report, which you don't discuss. You need to look at that. They have never responded to the 2005 Native Fish Report anywhere. And I believe that violates the APA. Okay. Thank you. Thank you. We thank all three counsel for very fine arguments. And the case of League of Wilderness Defenders, et cetera, shall be submitted, and the court shall adjourn until tomorrow. Thank you.
judges: Fisher, Gould, Christen